# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 15, 2004        Decided January 4, 2005
Reissued February 22, 2005

No. 03-5303

MARTHA HUTCHINSON,
APPELLANT

v.

CENTRAL INTELLIGENCE AGENCY AND
PORTER J. GOSS, DIRECTOR, CENTRAL INTELLIGENCE
AGENCY,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 99cv03118)

———

*Roy W. Krieger* argued the cause and filed the briefs for appellant.

*Charles W. Scarborough*, Attorney, U.S. Department of Justice, argued the cause for appellees. On the brief were *Peter D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney, and *Mark B. Stern* and *Catherine Y. Hancock*, Attorneys.

Before: GINSBURG, *Chief Judge*, and TATEL and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The Central Intelligence Agency fired appellant Martha Hutchinson following three years of poor performance ratings. Convinced she didn't get a fair shake, Hutchinson seeks relief on two grounds: under the Privacy Act, 5 U.S.C. § 552a(g)(1)(C), based on an alleged omission from her file during an internal appeal; and under the Fifth Amendment for alleged due process violations. Finding no error in the district court's grant of summary judgment in favor of defendants, we affirm.

## I.

In 1988, having received a B.A. in geography with distinction from George Mason University, appellant Martha Hutchinson became an imagery analyst at the CIA's National Photographic Interpretation Center. In CIA-speak, Hutchinson's job was to prepare "baselines" of "targeting components" or "TCOMs." In plain English, she analyzed satellite photos of intelligence-worthy locations, identifying typical features in order to detect changes over time. After she corrected a deficient baseline for a key location, Hutchinson alleges, she suffered from a practice she says is "known colloquially as 'flipping TCOMs.'" (Appellant's Br. at 12.) Again, to translate, her supervisors moved her rapidly from one assignment to another, seeking—she claims—to mar her performance.

On her next annual performance review, Hutchinson received a lackluster three out of seven. She earned the same score the following year, and the year after that her rating sank to two, indicating "marginal" performance. After she received a second two on a special review just three months later, the Special Activities Staff of the CIA's Office of Personnel

3

Security informed her that a "Personnel Evaluation Board" would convene nine days later "to discuss your performance and suitability for continued employment."

An SAS officer explained to Hutchinson that although she could not appear before the board in person, she could submit written comments and materials. Hutchinson did so, but the board nonetheless reached a "consensus" decision to terminate her for poor performance. Given a choice either to resign and accept a thirty-day contract or to appeal the PEB decision to the CIA's Executive Director Nora Slatkin—known as the "EXDIR"—Hutchinson chose the latter course. When Slatkin affirmed the PEB, Hutchinson appealed to the Director of Central Intelligence ("DCI"), and he, too, affirmed.

Alleging emotional and economic harm due to her firing, Hutchinson sued the CIA and several officials. Although Hutchinson asserted various theories of relief, and sought to add further claims and parties in an amended complaint, the district court, responding to defense motions, whittled the suit down to two counts: a Privacy Act claim against the CIA and a due process claim against George Tenet, then the DCI, in his official capacity. *See Hutchinson v. Tenet*, No. 99-3118 (D.D.C. Mar. 20, 2002); *Hutchinson v. Tenet*, No. 99-3118 (D.D.C. Jan. 28, 2003). Following limited discovery, the district court granted summary judgment for the defendants on both claims. *See Hutchinson v. Tenet*, No. 99-3118 (D.D.C. Aug. 28, 2003).

Hutchinson now appeals the summary judgment ruling. Our review is de novo. *See, e.g.*, *Maydak v. United States*, 363 F.3d 512, 515 (D.C. Cir. 2004).

## II.

Hutchinson's Privacy Act claim relates to an alleged omission from the file reviewed by EXDIR Slatkin. In an Equal Employment Opportunity proceeding unrelated to this case,

Hutchinson submitted an affidavit alleging that the correction of an analytic "remark" she prepared—one justification for her second rating of two—contradicted previous guidance Hutchinson had received and was "rife with referent errors." Because the CIA maintains separate records for PEB and EEO proceedings, the PEB never considered this affidavit. Hutchinson, however, could submit the affidavit to the EXDIR, and she alleges she did so—but thinks the document may never have arrived.

Pointing to correspondence indicating that EXDIR Slatkin had received no "additional information for me to review on your behalf" save a memorandum "stat[ing] that you do want to appeal the PEB decision," Hutchinson maintains that "the record is at best ambiguous" as to whether Slatkin actually considered the affidavit. (Appellant's Br. at 23.) Hutchinson makes this claim even though the CIA's file now includes that document and even though when she wrote back that she had sent correspondence "[o]n five (5) separate occasions," Slatkin responded, "I can understand your anxiety, and I want to reassure you that the information you sent to me did arrive." According to Hutchinson, the alleged omission of the affidavit breached the CIA's duty to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination," 5 U.S.C. § 552a(e)(5), entitling her to relief under the Privacy Act, *id.* § 552a(g)(1)(C).

We agree with the district court that Hutchinson's Privacy Act claim founders on at least two grounds. First, the record fails to support the claim's factual premise, namely, the absence of the affidavit from the EXDIR's file. Although we must draw reasonable inferences in favor of Hutchinson, the non-moving party at summary judgment, *see, e.g.*, *Beckett v. Air Line Pilots Ass'n*, 59 F.3d 1276, 1279 (D.C. Cir. 1995), we think it

unreasonable to suppose, absent evidence to the contrary, that EXDIR Slatkin did not mean what she said when she wrote, "[T]he information you sent to me did arrive." Citing an OPS date stamp on the letter advising Slatkin of the prior mailings, Hutchinson asserts that the OPS "was intercepting and perhaps filtering all of Appellant's efforts to communicate with the EXDIR." (Appellant's Br. at 24.) Yet because the letter bearing the stamp clearly made it to the EXDIR—after all, Slatkin responded to it—the stamp suggests no such thing. Nor does Slatkin's failure to list the documents she received cast doubt on whether the affidavit arrived: Hutchinson's letter referred specifically to the mailing that included the affidavit, making it illogical to suppose that the EXDIR would have responded as she did—"I want to reassure you that the information you sent to me did arrive"—had she not received that document. In short, Hutchinson's claim rests on speculation, and as the district court concluded, "Plaintiff's speculation does not create a genuine issue of material fact as to whether the account of the false correction was properly maintained in her personnel records."

Shifting focus, Hutchinson argues in her reply brief that even if EXDIR Slatkin reviewed the documents Hutchinson sent, the EXDIR likely failed to consider twenty classified pages from the affidavit. Whereas Hutchinson submitted five unclassified pages—two of which discuss the correction—her cover memo to the EXDIR stated, "Pages six through 25 of my sworn statement are classified evidence, hence I can only refer you to CIA/OEEO [Office of Equal Employment Opportunity] to procure these pages." Though now claiming that these twenty pages were critical, Hutchinson has forfeited this argument, for she raised it neither in her opening brief nor, as far as we can tell, in the district court. *See, e.g.*, *United States v. Hylton*, 294 F.3d 130, 135-36 (D.C. Cir. 2002) ("For decades, we have emphasized that an argument not made in the lower tribunal is deemed forfeited and will not be entertained absent exceptional

circumstances." (internal quotation marks omitted)); *Chedick v. Nash*, 151 F.3d 1077, 1084-85 (D.C. Cir. 1998) ("Because [plaintiff] made this argument for the first time in her reply brief, it is forfeited.").

The second flaw in Hutchinson's claim is that the record fails to show proximate cause—a vital element of a section 552a(g)(1)(C) claim. *See Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996) (listing elements). Asserting that the correction of her remark caused the off-cycle evaluation, which, in turn, triggered the PEB proceedings, Hutchinson argues that "[l]ittle could be more conclusive of probable cause." (Appellant's Br. at 26.) This analysis connects the wrong dots. To state a Privacy Act claim, Hutchinson must show not that the correction led to her termination, but rather that the omission of her affidavit regarding the correction caused the EXDIR and DCI to affirm where otherwise they might not have done so.

Hutchinson cannot make that showing because both decision-makers focused on her overall poor performance, rather than any one incident. The OPS memo on which EXDIR Slatkin based her decision, for example, referred to Hutchinson's "sustained poor performance despite intensive counseling, encouragement, mentoring, and detailed Advance Work Plan (AWP) over a two-to-three year period." It then listed five examples—without ever mentioning the correction of her remark. Even the off-cycle evaluation, to which Hutchinson attributes her termination, devoted only a few lines to the correction amid a discussion of performance problems extending for three single-spaced pages. True enough, the affidavit might have bolstered Hutchinson's claim that her supervisors were out to get her. Yet while neither EXDIR Slatkin nor the DCI blocked Hutchinson's firing, both were aware of her account switches: Hutchinson told the PEB—in a document she does not dispute was forwarded to Slatkin—that she "was . . .

averaging a new account every five to six months," and her memo to the DCI asserted, "I had an account for any time from two weeks to one year," creating "the near continual condition that all targets were unfamiliar." If the account changes failed to explain Hutchinson's poor performance, as EXDIR Slatkin and the DCI evidently concluded, then her supervisors' motives for "flipping TCOMs" were irrelevant.

Given the powerful evidence of long-term performance deficiencies and the EXDIR's and DCI's rejection of Hutchinson's account-switching theory, no reasonable fact-finder could conclude, even viewing the record in Hutchinson's favor, that the alleged withholding of the EEO affidavit caused the EXDIR and DCI to uphold her termination. We therefore agree with the district court that the record provides no basis for relief under the Privacy Act.

## III.

As to her second claim, Hutchinson correctly points out that a government employee may be deprived of liberty without due process if the employing agency combines adverse job action with "official defamation" or "a stigma or other disability that foreclosed the plaintiff's freedom to take advantage of other employment opportunities." *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) (internal quotation marks and brackets omitted); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972). Alleging that her termination forced her to abandon her chosen career in geography analysis, and emphasizing that a summary of the PEB proceedings listed "cognitive skills deficit, limited insight, and grandiose self view" among "major topics discussed," Hutchinson argues that defendants violated this standard.

As the district court observed, however, the record shows neither "that the CIA disparaged [Hutchinson] to potential private sector employers," nor that she suffered "a stigmatic

injury, aside from the stigma associated with being fired for poor performance," nor even that "the CIA has disclosed or will disclose to anyone the reasons for the plaintiff's termination." In fact, Hutchinson herself accuses the CIA only of discharging her for "purported deficient performance and publicizing this fact." (Amended Compl. ¶ 47.) As we explained in *Harrison v. Bowen*, 815 F.2d 1505, 1518 (D.C. Cir. 1987), unsatisfactory job performance "does not carry with it the sort of opprobrium sufficient to constitute a deprivation of liberty." Thus, even assuming that the characteristics discussed by the PEB factored in its decision, and even assuming that such attributes could be stigmatizing if publicized, Hutchinson has failed to establish injury to any constitutionally protected interests. Absent such injury, we need not consider whether, as Hutchinson claims, the notice she received and certain other aspects of her termination violated procedural due process standards. *See O'Donnell*, 148 F.3d at 1141-42 (affirming summary judgment where plaintiff failed to establish injury to a protected interest).

## IV.

Because neither of Hutchinson's claims afford any basis for relief, we affirm the district court's grant of summary judgment.

*So ordered.*